IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


DANIEL D.,[1]                                        No. 3:18-cv-00654-HZ

              Plaintiff,                OPINION & ORDER

    v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

              Defendant.


Nancy J. Meserow
7540 SW 51st Avenue
Portland, OR 97219

        Attorney for Plaintiff

Billy J. Williams
United States Attorney
Renata Gowie
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party. If applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Erin F. Highland
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Daniel D. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). The Court reverses the decision of the Commissioner and remands this case for further proceedings.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB on January 21, 2015, alleging an onset date of May 31, 2009. Tr. 147.[2] Plaintiff's date last insured is December 31, 2012. Tr. 147. His application for DIB was denied initially and on reconsideration. Tr. 151–57, 159–61.

      On April 19, 2017, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 99. On July 5, 2017, the ALJ found Plaintiff not disabled. Tr. 23. The Appeals Council denied review. Tr. 1. In its decision, the Appeals Council also found that additional evidence submitted by Plaintiff did not "show a reasonable probability that it would change the outcome of the decision." Tr. 2.

## FACTUAL BACKGROUND

      Plaintiff alleged disability based on chronic fatigue, Lyme disease, and depression. Tr. 262. At the time of his date last insured, he was 47 years old. Tr. 21. He has a high school

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed as Docket No. 12.

education and past relevant work as sheet metal fabricator, cabinet installer, construction contractor, and tool rental clerk. Tr. 21, 118.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant can perform other work that exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity after his alleged onset date of May 31, 2009, through his date last insured of December 31, 2012. Tr. 16. Next, at steps two and three, the ALJ determined that Plaintiff has the following severe impairments: "chronic fatigue syndrome, and degenerative joint disease affecting the right knee." Tr. 16. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 18. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to perform light work "except not more than occasional climbing." Tr. 18. Plaintiff could not perform any of his past relevant work, which was classified as above the light exertional range. Tr. 21. But at step five the ALJ found jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as mail sorter, laundry sorter, and office cleaner. Tr. 22. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 22–23.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation

marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by: (1) discounting Plaintiff's subjective symptom testimony; (2) discounting the opinion of treating physician A. Perry Hendin, MD; and (3) formulating an RFC after rejecting the medical opinion evidence and without further development of the record. Pl. Am. Br., ECF 18. Plaintiff also argues that a remand is warranted because new evidence submitted to the Appeals Council undermines the ALJ's decision. *Id.* This Court agrees.

## I.     New Evidence Submitted to the Appeals Council

Plaintiff argues that new evidence submitted to the Appeals Council changes the weight of the evidence such that the ALJ's decision is unsupported by substantial evidence. Pl. Am. Br. 2. "[W]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the

Commissioner's decision is supported by substantial evidence."[3] *Brewes v. Comm'r, Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012).

As the Commissioner points out, some of the evidence submitted to the Appeals Council was duplicative or outside the relevant period. Def. Br. 4, ECF 19. Yet much of the additional evidence is directly relevant to findings made by the ALJ in this case. *See Ward v. Colvin*, No. 3:14-CV-01162-HZ, 2015 WL 5032038, at *6 (D. Or. Aug. 25, 2015) (when new evidence conflicted with evidence upon with the ALJ relied and supported the discounted opinion of a medical provider, the Court found that the ALJ's decision was not supported by substantial evidence). As described below, the new evidence includes additional records from Dr. Hendin that contradict the reasons cited by the ALJ for discounting Plaintiff's testimony and the opinion evidence of Dr. Hendin. *See infra* Part II(D)–(C), Part III. After considering these new records, the Court finds that the ALJ's decision is unsupported by substantial evidence.

## II.     Subjective Symptom Testimony

Plaintiff argues that the ALJ erred in discounting his subjective symptom testimony. Pl. Am. Br. 23. The ALJ is responsible for determining credibility. *Vasquez*, 572 F.3d at 591. In assessing a claimant's testimony about subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929. The first stage is a threshold test in which the claimant must present objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Molina v. Astrue*, 674 F.3d

---

[3] Here, the Appeals Council listed the additional evidence in its decision and found "this evidence does not show a reasonable probability that it would change the outcome of the decision." Tr. 2. It then stated that it "did not consider and exhibit this evidence." Tr. 2. But the evidence did become part of the administrative record, tr. 32–99, and the parties do not dispute that the Court should consider this evidence consistent with *Brewes*, Pl. Am. Br. 2–3; Def. Br. 4. Accordingly, the Court considers the new evidence in reviewing the ALJ's decision. *See Hale v. Berryhill*, No. 3:17-CV-00697-HZ, 2018 WL 2221675, at *14 (D. Or. May 15, 2018).

1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage of this analysis, absent affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin*, 533 F.3d 1155, 1166 (9th Cir. 2008); *Lingenfelter*, 504 F.3d at 1036.

The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in the testimony. *Ghanim*, 763 F.3d at 1163; *Tommasetti*, 533 F.3d at 1039. In addition, conflicts between a claimant's testimony and the objective medical evidence in the record can undermine a claimant's credibility. *Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

When the ALJ's credibility findings are supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). But a general assertion that the plaintiff is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see also Morgan,* 169 F.3d at 599.

Plaintiff last worked in the construction industry in January 2009, when he made wood-on-metal furnishings for ships in a fabrication shop. Tr. 104, 244, 252. Plaintiff "guess[ed]" that he stopped working in construction because of an "inability to meet [his employer's] schedules"

and finish projects. Tr. 107. After this job, Plaintiff bought a van and tried to start his own disc-golf shuttle business. Tr. 108–09. For approximately two years, Plaintiff transported disc golfers to disc golf courses. Tr. 109. He hoped that this venture could be a source of income because he "was sure [he] couldn't work for anybody else" and could work on his own terms as a shuttle driver. Tr. 112. He only worked part time with "two routes a week." Tr. 109. Ultimately, however, Plaintiff could not continue driving the shuttle; he could not "mentally and physically push it through." Tr. 114. Because of his mental fatigue, he could not keep up with the office work required to run a business, and the business was operating at a loss. Tr. 114; *see also* tr. 109 (testifying he could not have worked full-time because his cognitive limitations made it difficult for him to manage the planning aspects of the job).

The symptoms of Plaintiff's impairments waxed and waned. Plaintiff testified that—during the relevant period—he would never know whether he would have a good day or a bad day. Tr. 110. On a bad day, he would wake up with joint pain, tightness in his neck, and brain fog. Tr. 110–11. On "really bad" days, he woke up with nausea, which prevented him from taking medication and sent him to the emergency room. Tr. 111. Plaintiff testified that he could not focus for eight hours on something without feeling wiped out and requiring rest the next day. Tr. 111, 110 (testifying that after a long disc-golf trip, he was not be able to do anything the next day). At times, he would play disc golf for an hour or so or would socialize with other golfers to stay connected with the community and promote the bus. Tr. 112. But he testified he could only play one round a day and would have a "down day" the following day. Tr. 113. Pain and fatigue kept him from doing more in a single day, and he would spend the next day bedridden, suffering from fatigue or migraines. Tr. 113–14.

At times, disc-golf trips were interrupted by his condition. For example, he once developed a "migraine situation" and was nauseous with a headache while driving. Tr. 110. He had to pull the bus over. Tr. 110. He "got sick for a little while at a truck stop area" but managed to take a shower and get back on the road about an hour and a half later. Tr. 110.

Plaintiff also testified that in 2011 and 2012, he could not have done daily housework. Tr. 115. He testified that he could do light work on a Monday but would be wiped out the following day with mental and physical exhaustion. Tr. 115. As a result of his impairments, Plaintiff's wife had to take on more around the house. Tr. 117. Consistent with his testimony, Plaintiff wrote in a function report that he relies on his wife for help with caring for the cats; performing housework such as dishes, tidying, laundry, and yardwork; and paying bills. Tr. 237–39. Plaintiff still goes shopping twice a week and plays disc golf once a week, but he does not leave the house four days a week because he is not well enough. Tr. 239. When he does play disc golf, he only plays one game a week and takes a chair with him to sit at every hole and transport his belongings. Tr. 240, 243.

The ALJ provided four reasons for discounting Plaintiff's subjective symptom testimony: (1) conflict with Plaintiff's activities of daily living; (2) Plaintiff's work activity after his alleged onset date; (3) Plaintiff's conservative treatment record; and (4) lack of support from the objective medical evidence. Because three of these reasons are unsupported by substantial evidence in the record, the ALJ erred in discounting Plaintiff's subjective symptom testimony.

A.      Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti*, 533 F.3d at 1039.  There are two grounds for using daily activities to form the basis of an adverse credibility determination: (1) when activities

meet the threshold for transferable work skills and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). However, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998), and "the mere fact that a plaintiff has carried on with certain daily activities, such as grocery shopping . . . does not in any way detract from his credibility," *Webb v. Barnhart,* 433 F.3d 683, 688 (9th Cir. 2005) (citing *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001)). To impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick,* 157 F.3d at 722. The ALJ cannot mischaracterize statements and documents in the record or take these out of context to reach his conclusion on the claimant's credibility. *Id.* at 722–23.

The ALJ cited various daily activities in discounting Plaintiff's subjective symptom testimony. These activities include participating in disc-golf tournaments through 2013, light household chores, yardwork, shopping in stores, and driving. Tr. 20–21. The ALJ concluded that these activities "are somewhat inconsistent with the testimony" and "less limited than would be expected given the allegations of disabling symptoms and limitations." Tr. 20.

As to some of these activities, the ALJ's decision is not clear or convincing. Plaintiff testified that he could do some light housework but received help with these activities from his wife. Tr. 117, 237–39. Plaintiff also wrote that he could shop twice a week and drive. Tr. 238. These activities are not inconsistent with Plaintiff's testimony, particularly as his symptoms wax and wane and he has both good days and bad days. Tr. 110–11.

However, there are inconsistencies in the record as to Plaintiff's ability to play disc golf. Plaintiff testified at the hearing that this activity was limited and he could only play one round of disc golf a day and would have a "down day" the day after. Tr. 112. But contemporaneous

medical records suggest he was less limited than alleged. Though he reported needing to rest after playing disc golf, he also told a naturopath in February 2012 that he had finished out a series of disc golf and had two tournaments scheduled for the first two weekends of the month after. Tr. 361. A few months later, Plaintiff told to the same provider that he had disc-golf tournaments three weeks in a row. Tr. 365. He further reported having a two-day tournament that went smoothly because he was well-prepared and had everything done early. Tr. 365. He also told his provider that he believed he had heat stroke from playing disc golf in 103-degree heat in August 2012. Tr. 369. In 2013, after Plaintiff's date last insured, he had a "long weekend" with "three days of physical activity right in a row." Tr. 379. These records conflict with his testimony and reasonably suggest, as the ALJ found, that Plaintiff was not as limited as alleged through his date last insured in December 2012. Thus, this is a clear and convincing reason for discounting Plaintiff's testimony.

B.    Work Activity

A claimant's work activity during a period of alleged disability may support the ALJ's decision to discount a claimant's testimony. *e.g.*, *Bray v. Comm'r*, 554 F.3d 1219, 1227 (9th Cir. 2009). The ALJ may consider work that a claimant engaged in—regardless of whether that work amounted to substantial gainful activity—in making his disability determination. Soc. Sec. Ruling (SSR) 16-3p, 2016 WL 1119029 (prior work and efforts to work are factors used to evaluate a claimant's credibility); *see also* 20 C.F.R. §§ 404.1571, 416.971 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

For example, in *Bray v. Commissioner*, the claimant had recently worked for two years as a personal caregiver and continued to seek out other employment after that. 554 F.3d at 1557.

The Court found that this finding—along with others—belied Plaintiff's claim of debilitating respiratory illness. *Id.* By contrast, the Ninth Circuit in *Lingenfelter v. Astrue* rejected the ALJ's reliance on the claimant's attempted return to work as undermining the claimant's limitations testimony. 504 F.3d at 1036–37. There, the claimant worked for nine weeks after his alleged onset date and during difficult economic circumstances. *Id.* at 1036. Ultimately, however, his work attempt failed because of his impairments. *Id.* at 1037. As a result, the court concluded that the failed work attempt was not a clear and convincing reason for concluding that his symptoms could not have precluded him from maintaining employment during the relevant period. *Id.*

At various places in his decision, the ALJ found that Plaintiff's work activities between his alleged onset date and his date last insured are inconsistent with Plaintiff's allegations of disability. He found that Plaintiff's disc-golf related business is "somewhat inconsistent with the extent of his alleged symptoms and limitations." Tr. 19. The ALJ further explains that "[a]lthough this work was not substantial gainful activity, it does show his symptoms were at least at times less limiting than alleged." Tr. 20.

Outside Plaintiff's testimony at the hearing, there is little information in the record about the extent of Plaintiff's disc-golf business. At the hearing, Plaintiff testified that he tried to start his business because he thought he could work on his own terms and was not sure he could work for anyone else. Tr. 112. Though he only worked part-time, he ultimately could not continue driving the shuttle because he was unwell. Tr. 114. He even recounted one incident where he got sick while driving the van and it took him an hour and a half to recoup. Tr. 110; *see also* tr. 367 (reporting to a naturopath that he got a migraine during a big event and was vomiting every five minutes). In other words, like the plaintiff in *Lingenfelter*, Plaintiff in this case attempted to work

for himself after his alleged onset and ultimately failed in his business venture because of his impairments. Thus, this reason is not a clear or convincing reason for discounting Plaintiff's symptom testimony.

C.    Conservative Treatment

An unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment can be a basis to discount a claimant's symptom testimony. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989); *see also Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment.") (internal quotation marks omitted). However, no adverse credibility finding is warranted where a claimant has a good reason for failing to obtain treatment. *See Orn*, 495 F.3d at 638. Gaps in medical treatment can also support an adverse credibility determination but not if the failure to obtain treatment is due to the claimant's lack of funds or another "good reason[]." *Id.* at 638; *see also* SSR 16-3p, 2016 WL 1119029, at *8-9. (Commissioner will not find an individual's symptoms inconsistent with a lack of treatment without considering possible reasons, including the inability to pay for treatment).

The ALJ discounted Plaintiff's testimony because of Plaintiff's treatment history. The ALJ emphasized that Plaintiff did not require aggressive treatment, "such as stimulants," for Plaintiff's chronic fatigue syndrome in 2009 and he did not seek any additional evaluation or treatment from a specialist after his diagnosis in 2009. Tr. 19. The ALJ also found: "The evidence shows little evaluation and treatment of his CFS and other physical impairments in 2010, and no evaluation and treatment in 2011." Tr. 19. The ALJ indicated that there was no explanation for this lack of treatment, such as lack of insurance coverage. Tr. 19. The ALJ also emphasized Plaintiff's conservative treatment by a naturopath in 2012. Tr. 20. Finally, the ALJ

notes that Plaintiff rarely complained of knee pain to his providers and did not seek additional evaluation or treatment after an x-ray revealed mild osteoarthritis in his knee in 2009. Tr. 20.

As to Plaintiff's knee pain, the record supports the ALJ's conclusion that Plaintiff's treatment has been minimal and conservative. Though Plaintiff reported knee pain and right femur or thigh pain to his providers in 2008 and 2009, Plaintiff received minimal treatment for his pain. Tr. 46, 64, 534. Plaintiff underwent an x-ray that revealed mild osteoarthritis of his right knee. Tr. 454. Otherwise, Plaintiff did not undergo any further treatment for or evaluation of his knee pain before his date last insured. Accordingly, the ALJ's finding that the treatment of Plaintiff's knee pain has been minimal is supported by substantial evidence and casts doubt on his allegations of disabling pain.

By contrast, the ALJ erred in discounting Plaintiff's testimony because of his treatment history for his chronic fatigue syndrome. First, the Court notes that "the CDC has made it clear that no definitive treatment for CFS exists." *Reddick*, 157 F.3d at 727. Thus, Plaintiff's failure to pursue aggressive treatment is not a legally sufficient basis for discounting Plaintiff's testimony. *See Lapeirre-Gutt v. Astrue*, 382 Fed. Appx. 662, 662 (9th Cir. 2010) (ALJ erred in relying on "conservative treatment" basis for rejecting plaintiff's subjective testimony as not credible when "the record does not reflect that more aggressive treatment options are appropriate or available"; noting that a "claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.").

The record also reflects that Plaintiff diligently sought treatment from Dr. Hendin in the two years before Plaintiff's diagnosis of chronic fatigue syndrome. Tr. 55–71. Plaintiff consistently reported fatigue and feeling debilitated. Tr. 55–71. Plaintiff pursued treatment for depression and underwent a sleep study to find the source of his fatigue. Tr. 45, 70, 76, 96. He

sought a second opinion regarding his fatigue in February 2009. Tr. 530–31. Plaintiff saw a

rheumatologist in May 2009, who opined that Plaintiff met the diagnostic criteria for chronic

fatigue syndrome. Tr. 534. On November 16, 2009, Dr. Hendin wrote that he knew of "no other

avenue for [treatment] at [that point]" for Plaintiff's "malaise and fatigue." Tr. 47. Plaintiff

testified that he was unable to continue seeing Dr. Hendin because of a change in his insurance in

2010. Tr. 106. But Plaintiff sought alternative treatment from a naturopath in 2009 and early

2010 and then a different naturopath in 2012. Tr. 36–41, 359–74. In the context of CFS, such a

treatment record does not cast any doubt on Plaintiff's credibility. *See Morgan-Self v. Astrue*,

*No. 2:11-CV-00459-SU, 2012 WL 2064386, at \*5 (D. Or. May 9, 2012)*, *report and*

*recommendation adopted*, No. 2:11-CV-00459-SU, 2012 WL 2064412 (D. Or. June 7, 2012)

(noting visits to various practitioners and physical therapy for chronic fatigue syndrome,

fibromyalgia, and back pain was not "conservative."); *Rau v. Comm'r Soc. Sec. Admin*, No. 14-

CV-03534-DMR, 2016 WL 705983, at \*10 (N.D. Cal. Feb. 23, 2016) (noting evidence Plaintiff

sought medical attention for chronic fatigue syndrome and no indication that further treatment

would have been fruitful). Accordingly, while Plaintiff's treatment history may cast doubt on

limitations caused by his knee pain, it does not reasonably cast doubt on Plaintiff's testimony as

to the severity of his chronic fatigue syndrome.

> D.      Objective Medical Evidence

The ALJ is instructed to consider objective evidence in considering a claimant's

symptom allegations. 20 C.F.R. § 416.929(c)(2) ("Objective medical evidence . . . is a useful

indicator to assist us in making reasonable conclusions about the intensity and persistence of

your symptoms[.]"). Inconsistency between Plaintiff's testimony and the objective medical

record is a valid reason to discount Plaintiff's testimony. *See Connett v. Barnhart*, 340 F.3d 871,

874 (9th Cir. 2003) (affirming the ALJ's credibility finding when the plaintiff's testimony of weight fluctuation was inconsistent with the medical record). The ALJ may also consider the effectiveness of any medication. *See Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995) ("Factors that the adjudicator may consider when making such credibility determinations include the . . . effectiveness or adverse side effects of any pain medication."). And in some cases, the ALJ can discount claimant testimony when that testimony is not supported by the objective medical record. *See Batson v. Comm'r Soc. Sec. Admin.,* 359 F.3d 1190, 1196 (9th Cir. 2007) ("'Graphic and expansive' pain symptoms could not be explained on objective, physical basis by claimant's treating physician."); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (The ALJ could consider mild findings on MRIs and X-rays in discounting the plaintiff's testimony as to her back pain.). But this may not be the ALJ's sole reason for discounting a claimant's testimony: "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick,* 157 F.3d at 722.

The ALJ discounted Plaintiff's testimony based on the lack of support from the objective medical evidence. First, as to Plaintiff's knee pain, the ALJ noted that the x-ray of Plaintiff's knee showed only mild arthritic changes and that he was not observed to have any difficulty ambulating due to knee pain. Tr. 20. Second, with regard to Plaintiff's chronic fatigue syndrome, the ALJ emphasized: (1) "[t]he lack of more frequent observations of fatigue by healthcare providers" and (2) normal range of motion in Plaintiff's joints and normal strength and gait. Tr. 19.

As to Plaintiff's knee pain, the ALJ's finding is supported by substantial evidence. In October 2008, Plaintiff saw Dr. Hendin because of right femur or thigh pain, but the records do

not reveal any limitations or complaints related to his knee except for a slightly diminished range of motion in extension. Tr. 64. Plaintiff reported right knee pain and swelling at a rheumatology consultation in May 2009. Tr. 534–35. And on November 16, 2009, Plaintiff reported that his right knee was "more achey/stiff" and that he could barely walk from the pain. Tr. 46. At that appointment, Dr. Hendin reported normal gait, normal joint effusions, and normal range of motion. Tr. 46. As a follow-up to this appointment, Plaintiff received an x-ray, which showed only mild osteoarthritis of his right knee. Tr. 454. These references to Plaintiff's knee pain appear to be the only objective medical evidence of Plaintiff's knee impairment during the relevant period. The ALJ therefore did not err in finding that the objective evidence does not support Plaintiff's testimony as to any functional limitations caused by his right knee.

As applied to Plaintiff's chronic fatigue syndrome, however, the ALJ's reasoning is not convincing or supported by substantial evidence. As described in Social Security Ruling 14-1P, titled "Evaluating Claims Involving Chronic Fatigue Syndrome," the "hallmark" of chronic fatigue syndrome is "the presence of clinically evaluated, persistent, or relapsing chronic fatigue" that is not lifelong, cannot be explained by a different disorder, is not the result of ongoing exertion or substantially alleviated by rest, and "results in substantial reduction in previous levels of occupational, educational, social, or personal activities." SSR 14-1P, 2014 WL 1371245, at *3. In addition, the Center for Disease Control requires "the occurrence of 4 or more specific symptoms that persisted or recurred during 6 or more consecutive months of illness and did not pre-date the fatigue." *Id.* These symptoms include:

    (1)    Postexertional malaise lasting more than 24 hours;

    (2)    Self-reported impairment(s) in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;

(3)     Sore throat;

(4)     Tender cervical or axillary lymph nodes;

(5)     Muscle pain;

(6)     Multi-joint pain without joint swelling or redness;

(7)     Headaches of a new type, pattern, or severity;

(8)     Waking unrefreshed.

*Id.* Various other symptoms may also exist, including muscle weakness, disturbed sleep patterns, respiratory difficulties, and cardiovascular abnormalities. *Id.* Often, individuals with chronic fatigue syndrome have "co-concurring conditions," such as fibromyalgia, irritable bowel syndrome, and migraines. *Id.*

In light of the signs and symptoms of chronic fatigue syndrome described above, the Court finds that lack of support from the objective evidence is not a clear or convincing reason for discounting Plaintiff's subjective symptom testimony. First, Plaintiff's normal range of motion, normal strength, and normal gait are not inconsistent with a diagnosis of chronic fatigue syndrome. Second, contrary to the ALJ's assertion, Plaintiff's fatigue is documented repeatedly in the record. On at least two occasions, providers observed that Plaintiff appeared fatigued. Tr. 41 (naturopath observing Plaintiff appears fatigued at February 2010 appointment), 361 (naturopath notices "extreme low energy" at February 2012 appointment). And Plaintiff reported fatigue at nearly every appointment in the record during the relevant period. Tr. 86, 55–57, 60–62, 65–66, 529, 69–71, 45–46, 36, 40, 362, 365–66. Third, the record reflects several of the primary symptoms of fatigue, including postexertional malaise lasting more than twenty-four hours, pain, difficulty concentrating, severe headaches, and waking unrefreshed. Tr. 529 (tired when waking), 70 (sore and stiff, hard to wake up in the morning), 46–47 (sleep non-restorative,

noting malaise), 361 (achiness and pain), 367 (muscle cramps), 371 (needs to recover if he overdoes it), 373 (reports cognitive difficulty with challenging tasks). Plaintiff also has secondary symptoms, such as disturbed sleep patterns, tr. 55–57 (reports insomnia and poor sleep), 365 (poor sleep), and co-concurring migraines, tr. 46 (reporting migraines that impair him to the point of nausea), 367 (reporting migraine during big disc-golf event). In May 2009, a rheumatologist also opined that Plaintiff met the following symptom criteria: (1) impairment in short-term memory or concentration per self-report; (2) headache of a new pattern or severity; (3) unrefreshing sleep; and (4) postexertional malaise lasting more than 24 hours. Tr. 534. Based on the record, therefore, the Court finds that the ALJ erred in discounting Plaintiff's subjective symptom testimony because his chronic fatigue syndrome was unsupported by the objective medical evidence.

### III.     Opinion of A. Perry Hendin, MD

Plaintiff argues that the ALJ erred in giving little weight to the opinion of treating physician A. Perry Hendin, MD. Pl. Am. Br. 14. There are three types of medical opinions in social security cases: those from treating, examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of an examining physician over that of a reviewing physician, *id.*, and more weight is given to an examining physician than to a nonexamining physician, *See Garrison v. Colvin,* 759 F.3d 995, 1012 (9th Cir. 2014). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may reject it only for clear and convincing reasons. *Id.*; *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial

evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. However, the ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Here, the parties agree that the clear and convincing standard applies. Pl. Am. Br. 15; Def. Br. 7 n.4.

Dr. Hendin treated Plaintiff before and during the relevant period. Tr. 46–71. However, he did not render an opinion as to Plaintiff's medical conditions until April 14, 2017, over four years after Plaintiff's date last insured. Tr. 671. In a chronic fatigue syndrome questionnaire provided to Dr. Hendin by Plaintiff's attorney, Dr. Hendin stated that Plaintiff carries an official diagnosis of chronic fatigue syndrome. Tr. 670. He opined that the symptoms began in October 2006. Tr. 670. Plaintiff's symptoms include muscle weakness, disturbed sleep, visual difficulties, cardiovascular abnormalities, and gastrointestinal discomfort, all of which began prior to 2010. Tr. 670. Dr. Hendin also found that Plaintiff suffers from the following co-concurring conditions: fibromyalgia and/or myofascial pain syndrome; IBS; Raynaud's phenomenon; and migraines. Tr. 670. On examination at every office visit, Plaintiff had persistent, reproducible muscle tenderness, including the presence of tender points. Tr. 671. He opined that Plaintiff could not sustain a normal 40-hour workweek. Tr. 671. Dr. Hendin also concluded that Plaintiff's inability to work competitively full-time began in 2006. Tr. 671.

The ALJ provided four reasons for giving Dr. Hendin's opinion little weight. Tr. 21. Two of these reasons are clear and convincing. First, the ALJ found that several of the listed co-concurring medical conditions are not documented in the record. Tr. 21. Here, the ALJ's finding was reasonable as to fibromyalgia, IBS, and Raynaud's phenomenon prior to Plaintiff's date last insured. Dr. Hendin's records during this period do not definitively establish any of these conditions. *See* tr. 46–71.

Second, the ALJ found that the opinion is inconsistent with evidence Plaintiff worked full time until 2009. Tr. 21. The record supports the ALJ's assertion. Plaintiff reported that he worked around forty hours per week in his prior jobs. Tr. 244–50. Plaintiff was only unemployed for 2 months between January 2006 and January 2009, when he appears to have stopped working. Tr. 244. Though Plaintiff only earned $5,387.75 in 2006 and $8,884.80 in 2007—years in which Plaintiff was also self-employed—Plaintiff earned $19,823.91 in 2008 in a fabrication shop. Tr. 234, 232, 244.

The two other reasons the ALJ provides, however, are not clear or convincing. The ALJ discounted Dr. Hendin's opinion because of Plaintiff's limited treatment history with Dr. Hendin during the relevant period. Tr. 21. He notes that Dr. Hendin saw Plaintiff only one or two times "during the relevant period" and not at all from June 2009 through the date last insured. Tr. 21. He found that this was "a factor that significantly limits the weight given to [Dr. Hendin's] opinion." Tr. 21. He also noted that Dr. Hendin offered little explanation for his opinion. Tr. 21. This reasoning, however, is unsupported by substantial evidence in the record. Dr. Hendin saw Plaintiff twelve times in the year and a half before Plaintiff's alleged onset date. Tr. 46–71. At these appointments, Plaintiff consistently reported issues with worsening fatigue. Tr. 46–71. Further, Dr. Hendin saw Plaintiff on November 16, 2009, almost six months after his alleged onset date. At that appointment, Plaintiff reported that he was "barely functional." Tr. 46. He noted migraines, constant exhaustion, and poor non-restorative sleep. Tr. 46. Dr. Hendin noted at this appointment that Plaintiff had tried and failed different stimulants and that he knew of no other avenue for treatment for Plaintiff at that point. Tr. 47. Thus, the ALJ erred in finding that Plaintiff had a limited treatment history with Dr. Hendin during the relevant period.

The ALJ also asserts that Dr. Hendin's opinion is inconsistent with the "weak objective medical evidence and the routine and conservative treatment history." Tr. 21. The ALJ explains that Plaintiff was rarely observed as fatigued by healthcare providers and exhibited normal strength and gait. Tr. 21. As detailed above, this reasoning is not clear or convincing given the treatment record and Plaintiff's diagnosis of chronic fatigue syndrome. *See supra* Part II(C)–(D). Thus, the ALJ erred in discounting Dr. Hendin's opinion for this reason.

On balance, the Court finds that the ALJ erred in discounting Dr. Hendin's opinion as to the effect of Plaintiff's chronic fatigue syndrome on his ability to work. In light of the medical record, Plaintiff's capacity to work in the years leading up to his alleged onset date is not, on its own, sufficient to assign limited weight to Dr. Hendin's opinion. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (finding "one weak reason . . . insufficient to meet the 'specific, clear and convincing' standard" on the record before the court). Thus, the ALJ erred.

## IV.    RFC Formulation

Plaintiff alleges that the ALJ erred in formulating the RFC because there was no medical opinion indicating that Plaintiff could perform light work. Pl. Am. Br. 25. In concluding that Plaintiff could perform light work, Plaintiff asserts that the ALJ erroneously substituted his own lay opinion in lieu of the opinions of the medical experts. *Id.* "In determining a plaintiff's RFC limitations, an ALJ may not rely on his own unsupported interpretation of the medical evidence." *Davis v. Colvin*, No. 3:15-CV-00843-SI, 2016 WL 8674265, at *8 (D. Or. Aug. 12, 2016) (citing *Williams v. Astrue*, 355 Fed.Appx. 828, 832 n.6 (5th Cir. 2009) (finding that "the ALJ impermissibly relied on his own medical opinions as to the limitations presented"); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the

determination."); and *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings")).

In *Davis v. Colvin*, for example, "the ALJ gave little weight to the examining physician and expressly disregarded the reviewing physician's assessment that [the plaintiff] could only stand for two hours in an eight-hour work day." 2016 WL 8674265, at *8. He failed to address a third opinion of a state agency physician who found the same limitation as to Plaintiff's ability to stand. *Id.* The district court noted that "the ALJ considered and purportedly placed significant weight on the objective medical evidence throughout the decision, but failed to explain how it, or any other evidence, supports the ALJ's RFC[.]" *Id.* Accordingly, the court found that the ALJ's assessment that Plaintiff could stand or walk for up to six hours in an eight-hour workday was not supported by substantial evidence. *Id.*

Here, like in *Davis*, the ALJ discounted all the medical opinion evidence. The ALJ gave little weight to the state agency medical consultants, who "reported that there was insufficient evidence to evaluate the claimant's impairments before the date last insured." Tr. 21. He then clarified that the evidence developed at the hearing level was sufficient to adjudicate the case, but the ALJ also gave little weight to the opinion of Dr. Hendin, as detailed above. Tr. 21. The ALJ concluded his RFC assessment by finding that it was "supported by the substantial weight of the evidence of record, particularly the weak objective evidence, and routine and conservative course of treatment, and partially, by the claimant's level of functioning in activities of daily living." Tr. 21. But the ALJ's findings that the objective evidence was weak and that Plaintiff underwent a routine and conservative course of treatment are unsupported by the record. *See supra* Part II(C)–(D). Given these errors and the lack of medical or opinion evidence from

which to evaluate Plaintiff's RFC, the Court finds that the ALJ erred in formulating Plaintiff's RFC.

## CONCLUSION

Based on the above, the Commissioner's decision is REVERSED and REMANDED for further administrative proceedings.

IT IS SO ORDERED.

Dated this _____ day of _____, 2019.

MARCO A. HERNÁNDEZ
United States District Judge